IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| HOWARD REEVES AND COLLEEN REEVES, | ) ) ) |
| Plaintiffs, | ) Civil Action No.: 06 C 5540 ) |
| v. | ) Suzanne B. Conlon, Judge ) |
| COMMONWEALTH EDISON COMPANY, EXELON GENERATION COMPANY, LLC d/b/a/ EXELON NUCLEAR AND EXELON CORPORATION,[1] | ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Howard and Colleen Reeves ("the Reeves") sue Commonwealth Edison Company, Exelon Generation Company, LLC d/b/a Exelon Nuclear ("Exelon") for contaminating their property by releasing tritiated water from Exelon's Braidwood nuclear power plant. They bring claims under the Price-Anderson Act, 42 U.S.C. §§ 2014, 2210, for private and public nuisance, negligence, negligence *per se*, strict liability, trespass, intentional infliction of emotional distress, and negligent infliction of emotional distress. Exelon moves for summary judgment and moves to exclude expert opinions from Timothy A. Boos, Michael S. McCann, and Charles A. Southcomb. The Reeves cross-move for summary judgment on the issue of liability, and to exclude the expert opinion of Jesse Phillip Harvey. For the reasons stated below, Exelon's motions are granted and the Reeves' cross-motion for summary judgment is denied.

I.   **SUMMARY JUDGMENT STANDARD**

---

[1] Exelon Corporation was dismissed with prejudice on December 27, 2007 based on its uncontested motion for summary judgment.

On cross-motions for summary judgment, each movant must satisfy Fed. R. Civ. P. 56's requirements. *Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 665 (7th Cir. 2007). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986); *Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995). Each movant has the burden of establishing there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant satisfies this burden, the non-movant must set forth specific facts supported by admissible evidence that establish a genuine issue for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Batish v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). An expert opinion does not constitute sufficient evidence to establish a genuine issue of fact for trial unless the opinion is admissible. *See, e.g., Ervin v. Johnson & Johnson, Inc.* 492 F.3d 901, 904 (7th Cir. 2007).

## II. BACKGROUND UNCONTESTED FACTS

This lawsuit is one of four related cases alleging claims based on the release of tritiated water, a low-level radioactive substance, from Exelon's Braidwood Nuclear Generating Station ("the station"). The Reeves own a single family home nearby ("the residential lot"). The Reeves' home is adjacent to an approximately 33 acre lot containing a lake that is held in an

Illinois land trust ("the lake lot"). Def. Facts ¶ 14. Mr. Reeves is one of five beneficiaries under the lake lot trust; the other four non-party beneficiaries also own lots adjacent to the lake lot. *Id.* ¶ 16. There are no allegations in the complaint about contamination in the lake lot, only on the Reeves' residential lot. *Id.* ¶ 15. The Reeves claim their property was contaminated and damaged by Exelon's tritiated water release.

Since January 1, 2001, Exelon has operated the station pursuant to a U.S. Nuclear Regulatory Commission ("NRC") license. Under its license, Exelon disposes of tritiated water. Tritium is a hydrogen isotope that occurs naturally, and is present in water everywhere. *Id.* ¶ 19. It is also a by-product of the operation of nuclear power plants. *Id.* ¶ 20. Tritium bonds with oxygen to form tritiated water, a low level radioactive substance. *Id.* ¶ 21. Exelon first dilutes tritiated water and then pumps it down an approximately 5-mile underground pipeline, known as the blowdown line, into the Kankakee River. *Id.* ¶¶ 23-24. On several occasions between 1996 and 2005, tritiated water was accidentally released from vacuum breakers along the blowdown line. *Id.* ¶ 25. Some of the tritiated water migrated into groundwater. *Id.* ¶ 26.

On December 2, 2005, Exelon announced that its ongoing investigation revealed that tritiated water entered the groundwater. *Id.* ¶ 27. Later that month, an Exelon representative sent Mr. Reeves an email stating that "if we cause you a loss, we will make you whole." Pl. Facts ¶ 7. In another letter sent to Reeves on January 20, 2006, an Exelon representative stated that "should the tritium release be shown to have impacted your property and caused a decrease in the market value of the your property at the time at which you sell your property, Exelon . . . will compensate you." *Id.* ¶ 8.

The NRC investigated the tritium spills. Def. Facts ¶ 28. It inspected the station, assessed radiation dose exposure, and reviewed a comprehensive radiation dose assessment prepared by the station and independent health physicists. *Id.* ¶ 29. On May 25, 2006, the NRC issued a letter describing its preliminary findings:

> Based upon the current radiological conditions and the concentrations of tritium identified at the Braidwood site, the NRC estimated . . . the doses from the contamination to be a very small fraction of the NRC's limit for doses to members of the public and insignificant relative to normal background radiation dose. We have also received a more comprehensive assessment from your staff that calculated bounding doses for the historical, unplanned radioactive releases . . . [O]ur inspection determined that public health and safety has not been, nor is likely to be, adversely affected by the historical circulating blowdown line vacuum breaker leaks.

*Id.* ¶ 30.

When the Reeves first heard about the tritium spills at the end of 2005, they decided not to live at the residential lot, opting instead to purchase property in Joliet, Illinois in June 2006. *Id.* ¶ 37. They did so because of their own subjective fears. *Id.* ¶ 38.

There is no evidence that the Reeves' residential lot is contaminated. *Id.* ¶ 39. The only evidence that the lake lot is contaminated is offered in the Reeves' expert report prepared by geologist Timothy Boos. *Id.* ¶ 39. Boos opined that the lake lot contained elevated levels of tritium. In formulating this opinion, he took one sample from the residential lot, the lake lot, and an upgradient pond. *Id.* ¶ 56. He used the upgradient pond sample to establish normal background levels that would be present if tritium spills had not occurred. *Id.* ¶ 56. These samples were sent for tritium testing, resulting in the following (in picocuries per liter, or "pCi/l"):

4

  Lake water from the lake lot:     41 pCi/l, +/- 7.6 pCi/l.
  Pond water from upgradient pond:  28.6 pCi/l, +/- 7.5 pCi/l.
  Well water from residential lot:   16.2 pCi/l, +/- 7.3 pCi/l.

*Id.* ¶ 57.[2] In addition to the upgradient pond sample, Boos also relied on four Illinois State Water Survey measurements of four groundwater wells to ascertain whether his background tritium level was appropriate. *Id.* ¶ 58. The groundwater well measurements ranged from tritium levels of 22 to 42.2 pCi/l. *Id.* ¶ 58.

There is no evidence that the residential or lake lots are unsafe, or that use of either property should be restricted. *Id.* ¶¶ 40-41. The Illinois Department of Public Health advised the Reeves in two separate letters that: "[b]ased on [our] results, we do not recommend any changes in your current water use patterns." *Id.* ¶ 43. The Reeves did not offer any expert opinion regarding health, safety, or radiation dose as a result of tritiated water release. *Id.* ¶ 50.

Both the residential and lake lots have been tested for tritium on at least twelve occasions. With one exception reported by Boos, every test result has been below the applicable lower limit of detection, meaning that every test did not reliably detect the presence of tritium at any level. *Id.* ¶ 42. The tritium limit in public water systems under the Federal Safe Drinking Water Act ("the Safe Water Act") and for groundwater under the Illinois Groundwater Protection Act ("the Illinois Groundwater Act") is 20,000 pCi/l. 40 C.F.R. § 141.66(d)(2); Ill. Admin. Code 35 § 620.410(e)(3).

Reeves' appraisers Michael McCann and Charles Southcomb offered opinions regarding the market value of the residential lot (bundled with rights under the lake lot trust) before and after assumed tritium contamination. *Id.* ¶ 64. McCann opined that after the Reeves' property

---

  [2] pCi/l is the standard measurement for the amount of radioactive substances

was contaminated, it declined $450,000, from $500,000 to $50,000. *Id.* ¶ 66. According to Southcomb, the property value declined $225,000, from $425,000 to $200,000. *Id.* ¶ 65. Southcomb's "before and after" opinions were confined to an effective date of November 5, 2005. *Id.* ¶ 70. Both appraisers premised their opinions on assumptions of current contamination on both the residential and lake lots. *Id.* ¶ 67.

## III. DISCUSSION

### A. Exelon's Motion for Summary Judgment

Exelon moves for summary judgment on four grounds: (1) the Reeves have no evidence that Exelon violated a duty owed to them under the Price-Anderson Act; (2) there is no evidence that there was physical damage to the Reeves' property; (3) there is no evidence the Reeves suffered economic loss or emotional distress, even if those claims are cognizable absent physical harm; and (4) the expert opinions of Boos, McCann, and Southcomb are inadmissible, and the Reeves have no admissible evidence of property damage or economic loss.

#### 1. *Violation of a Duty Under the Price-Anderson Act*

Because the Reeves bring a public liability action under the Price-Anderson Act, federal nuclear safety regulations provide the sole measure of Exelon's duty. *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994), *cert. denied*, 512 U.S. 1222, 114 S. Ct. 2711 (1994); *Duffin v. Exelon Corp.*, No. 06 C 1382, 2006 WL 1710597, at *2 (N.D. Ill. June 16, 2006) (Conlon, J.). Exelon contends that 10 C.F.R. § 20.1301(a) provides their sole duty in this case. Section 1301 exhaustively defines the duties owed to public liability plaintiffs by establishing the dose limits for individual members of the public. The regulation directs NRC licensees to conduct operations so that the radiation dose exposed to the public outside the

6

boundaries of the licensed facility does not exceed either (i) 100 millirems in a year, or (ii) 2 millirems in an hour. These dose limits are the maximum permitted under all conditions, whether by accident or under normal operations. *In re TMI Litig., III*, 67 F.3d 1103, 1114 (3d Cir. 1995).

The Reeves respond that 10 C.F.R. § 20.1301(a) and *O'Connor* are inapplicable because "no provision or section of the Act [is applicable] to property damage claims." Pl. Opp. at 6. They insist instead that Illinois law supplies the duty owed for each of their claims. However, they fail to support their argument with any binding authority. This court previously rejected the Reeves' argument. *O'Connor* mandates that federal regulations provide the applicable standard of care in a public liability action, whether or not the claim is for property damages. *See Devine v. Commonwealth Edison Co.*, No. 06 C 2383, 2006 WL 2038593, at * 3 (N.D. Ill. July 19, 2006) (citations omitted). *O'Connor* explicitly declined to apply a state standard that was inconsistent with the Price-Anderson Act. 13 F.3d at 1105.

Federal nuclear regulatory standards, and specifically § 1301's dose limits, have been applied to claims involving property damage. *See Carey v. Kerr-McGee Chemical Corp.*, 60 F. Supp. 2d 800, 807-11 (N.D. Ill. 1999) (Gettleman, J.); *Osarczuk v. Assoc. Univs., Inc.*, No. 96-2836, slip op. At 5-7 & n.8 (N. Y. Sup. Ct. Mar. 10, 2005); *accord Nieman v. NLO, Inc.*, 108 F.3d 1546, 1553 (6th Cir.1997) ("the Price-Anderson Act preempts ... state law claims [for property damage]"); *In re TMI Litig.*, 940 F.2d at 859 (same). In *Carey*, for example, landowners asserted state nuisance and trespass claims based on radioactive dust invading their property. 60

F. Supp. 2d at 802, 809. This court applied *O'Connor* and held that § 1301(a)'s dose limits were the sole duty owed to the landowners under their property damage claims. *Id.* at 807-11.

This case is analogous to *Carey*. The Reeves' property damage claims are inextricably linked to health concerns associated with their property, making § 1301(a)'s dose limits the appropriate measure of Exelon's duty. *See, e.g., id.* at 802 (combining health injuries and property damage claims); *Boggs v. Divested Atomic Corp*, No. C-2-90-840, 1997 WL 33377790, at *3 n.7, *8 (S.D. Ohio Mar, 24, 1997) (same); *Osarczuk*, supra, at 5-7, n.8 (same); *compare* Compl. at 7-14 (alleging hazardous effects on property).

There is no evidence in the record to support a reasonable inference that Exelon violated § 1301(a)'s dose limits. The Reeves have not offered any expert competent to provide an opinion on radiation dosages. Reeves' expert Boos admitted he had no training in dosimetry, never calculated a radiation dose, and would not proffer an opinion about radiation exposures to individuals. Boos' report only identified three inapplicable regulatory standards that he contends Exelon violated. Boos claims Exelon violated (1) the Safe Water Act, which applies only to public water systems, not the Reeves' property, *see* 40 C.F. R. § 141.3; (2) the Federal Water Pollution Control Act, which does not apply because it applies only to "navigable waters of the United States," *see Vill. of Oconomowoc Lake v. Dayton Hudson Corp.*, 24 F.3d 962, 964-65 (7th Cir. 1994); and (3) the Illinois Groundwater Act, which does not apply because it is not a federal nuclear safety regulation. *See Devine*, 2006 WL 2038593, at *3-4.

There is simply no evidence that Exelon violated a federal nuclear regulatory standard. The NRC concluded in its investigation of the tritium leaks that the doses from the contamination

8

were a small fraction of the NRC's dosage limit for public exposure. Def. Facts ¶ 30. Summary judgment is warranted on this ground alone.

### 2. *Exelon's Daubert Motions*

Summary judgment is also warranted because the Reeves rely exclusively on expert opinions for their claims of property damage and economic loss. None of the expert opinions are admissible. Evidence submitted at the summary judgment stage must be admissible at trial. *Woods v. City of Chicago*, 234 F.3d 979, 988 (7th Cir. 2000). The Reeves bear the burden of establishing the admissibility of its expert opinions by a preponderance of the evidence. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 581 (1993); Fed. R. Evid. 702 Advisory Committee Notes, 2000 Amendments (the admissibility of expert testimony is governed by Rule 104(a), which puts the burden on the proponent to establish admissibility by preponderance). The court has wide latitude and discretion in determining whether to admit expert testimony. *Wintz by & Through Wintz v. Northrop Corp.*, 110 F.3d 508, 512 (7th Cir. 1997).

Fed. R. Evid. 702 provides that an expert may offer opinion testimony if: (1) the expert is properly qualified as an expert by knowledge, skill, experience, training, or education; (2) the testimony will assist the trier of fact to understand the evidence or determine the fact in issue; (3) the testimony is based upon sufficient facts or data, (4) the testimony is the product of reliable principles and methods, and (5) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702; *Ervin*, 492 F.3d at 904. In determining reliability, the following non-exhaustive list of guideposts guide the court: (1) whether the scientific theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; and (3) whether the theory has been generally accepted in the scientific community. *Ervin*, 492

F.3d at 904 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Under these standards, expert testimony must be relevant and factually linked to the case in order to satisfy Rule 702. *United States v. Gallardo*, 97 F.3d 727, 733 (7th Cir. 2007). Expert evidence must be excluded if it is connected to existing data only by the *"ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### a. Geologist Timothy Boos

Exelon argues Boos' expert opinion should be excluded because it is unreliable, ignores undisputed facts, and offers improper legal opinion. The Reeves respond that Boos' opinion is admissible to demonstrate that the Exelon leaks resulted in a trespass onto the Reeves' property. The Reeves do not meet their burden to show that Boos' testimony is admissible by a preponderance of the evidence. Rather, due to the unreliability of Boos' findings, the false assumptions he makes regarding contamination, and his opinion on issues outside the realm of his expertise, his opinion is precluded.

### *1. Opinion Regarding Current Contamination*

Boos reported that the Reeves' property is "contaminated" because a groundwater sample from the residential lot had a tritium content of 16.2 pCi/l and a sample from the lake lot had a tritium level of 41 pCi/l. Boos Rep. at 28. He contrasted these samples with the background level sample of 28 pCi/l he took from an upgradient pond. Boos did not conclude he found an elevated tritium level on the residential lot. Rather, he concluded that the lake lot has an elevated tritium level (41 pCi/l > 28 pCi/l). His opinion is flawed by his methodology. He did not obtain adequate samples.

10

Boos acknowledged that his method of procuring his 28 pCi/l background sample did not meet generally accepted standards for a background study and that he would not publish such a sampling in a peer-reviewed paper. Boos Dep. at 112:13-114:12. His report stated that under regulatory standards, a "site specific background concentration" that is "statistically valid" must be derived "from multiple samples and typically multiple locations." Boos Rep. at 27-28. However, he did not abide by this standard. His 28 pCi/l background level was based on just one sample from an upgradient pond. *Id.* at 28. As a result, Boos conceded that he did not know whether his sample was statistically representative of the background tritium concentration in groundwater in the Braidwood area. Boos Dep. at 155:21-156:11. The failure to conduct sufficient sampling draws into question his "background" valuation. *See, e.g., Allgood v. Gen. Motors Corp.*, No. 102CV1077, 2006 WL 2669337 (S.D. Ind. Sept. 18, 2006) (expert's opinion inadmissible where expert used only a limited number of available soil samples and offered no explanation for his sample choices).

Boos also relied on Illinois State Water Survey measurements to buttress his single background sample. The four Illinois State Water Survey measurements were drawn from wells up to 100 miles from Braidwood and were not site-specific samples. Moreover, the Illinois water survey tritium results ranged from 22 to 42.2 pCi/l. Boos Dep. at 104:6-105:13. Boos' lake lot results squarely fit in this range. His opinion that the lake lot contained *elevated* levels of tritium is all the more suspect. His results are further undermined by the fact that he chose surface water for his samples rather than groundwater. By doing so, he acknowledged the tritium concentrations in the water could have been skewed, especially since it was raining the day he

11

collected the samples. *Id.* at 149:17-23; 150:19-21; 152:4-6. This flaw illustrates the unreliability of obtaining only single samples to measure tritium levels.

Additionally, Boos' opinion regarding present contamination is unreliable because he does not provide a scientific basis for his conclusion that the lake lot is "contaminated" or "damaged." He merely equates "elevated" levels with contamination. Boos conceded that all water on earth contains tritium, and it is undisputed that drinking two quarts of water with tritium concentrations of 41 pCi/l daily for an entire year would cause a radiation dose lower than the doses caused by eating a slice of a tomato or drinking a few ounces of milk on a single occasion. Def. Mem. App. 20. Indeed, the 41 pCi/l figure is just 0.205% of 20,000 pCi/l, which is acceptable under both the Safe Water Act and Illinois Groundwater Act standards for tritium concentration. *See* 40 C.F.R. § 141.66(d)(2) & Table A; Ill. Admin Code 35 § 620.410(e)(3).

### 2.    *Opinion Regarding Future Contamination*

Boos' opinion regarding future contamination on the Reeves' property is inadmissible because it is premised on false assumptions. Boos opined that absent "additional remedial efforts beyond just pumping of the Exelon Pond," the Reeves' property will suffer from future tritium contamination. Boos Rep. at 20. Boos did not conduct any modeling or other independent scientific analysis to support this conclusion. Rather, his methodology consisted solely of his assessment of an August 2006 report prepared by Exelon's environmental consultants, Conestoga-Rovers & Associates. In the August 2006 report, Conestoga-Rovers detailed various remediation scenarios that would prevent higher tritium concentrations from appearing on the Reeves' property in the future. *Id.*

12

One of the scenarios involved remedial pumping at Exelon Pond (east of the Reeves' property) and pumping at three new extraction wells south of the Reeves' property. Boos endorsed this scenario to remedy any rise in tritium levels. *Id.* The error in his methodology is that he reached this conclusion in May 2007, after Exelon had implemented the remedial report in October 2006. His opinion that the Reeves' property is subject to future contamination therefore ignores the undisputed fact that remedial measures he advocated were already taken.

### 3. Opinion Regarding the Illinois Real Property Disclosure Act

Boos opined that the Illinois Residential Real Property Disclosure Act, 765 ILCS 77/1 *et seq.*, requires the Reeves to disclose to prospective buyers "material defects" in the plumbing system and "unsafe conditions" in the drinking water based on the tritium issue. Boos Rep. at 39. According to Boos, under the Disclosure Act there is no "threshold that would eliminate the need for reporting." Boos Dep. at 91:3-8. Boos is not qualified to render these legal opinions. He is not a lawyer and does not have any legal training. Def. Facts ¶ 53; *RLJCS Enter., Inc. v. Prof'l Ben. Trust Multiple Employer Welfare Ben. Plan and Trust*, 487 F.3d 494, 498 (7th Cir. 2007). Aside from the impropriety in offering these legal opinions, his opinion is unreliable because he does not substantiate what constitutes "material defects" or "unsafe conditions."

Boos acknowledged that he has no expertise regarding the health effects of tritium or its safety, which disqualifies him from opining on safety issues. Boos Dep. at 32: 17-19; *see, e.g., Muzzey v. Kerr-McGee Chem. Corp.*, 921 F. Supp. 511, 512-13, 519 (N.D. Ill. 1996) (Bucklo, J.) (experts unqualified from opining on health effects of radiation exposure because they had little relevant experience in that area). Boos failed to identify anything wrong with the Reeves'

13

"plumbing system," nor did he offer any basis to conclude the residential lot's well water had elevated tritium levels. Boos Rep. at 28. His opinion that "material defects" to the Reeves' plumbing system and "unsafe conditions" are not admissible, as these subjects are outside his expertise and belied by his own testimony.

*4.  Remaining Opinions Regarding Regulatory Violations*

Under *O'Connor*, federal nuclear safety regulations define the duties owed to the Reeves under their Price-Anderson Act claims. 13 F.3d at 1105. Boos has not suggested that any relevant federal nuclear safety regulation has been violated. Boos opined that Exelon violated the Safe Water Act, Exelon's NPDES permit (issued under the Federal Water Pollution Control Act), and the Illinois Groundwater Act. But these regulations do not apply to the Reeves' claims and are therefore irrelevant.

### b. Appraisers Michael McCann and Charles Southcomb

Summary judgment is warranted on the ground that both Michael McCann's and Charles Southcomb's appraisal opinions are inadmissible and unreliable. The Reeves rely exclusively on the opinions of McCann and Southcomb to support their allegation that they have sustained economic loss due to property damage. McCann opined that as of May 1, 2007, the residential property was worth $500,000 in the absence of tritium contamination, and depreciated to $50,000 due in part to elevated tritium levels on both the residential and lake lots. Southcomb opined that as of November 5, 2005, the Reeves' property was worth $425,000 in the absence of tritium contamination, and depreciated to $200,000 due in part to elevated tritium levels on both the residential and lake lots at "unsafe" levels. Under *Daubert*, McCann's and Southcomb's opinions are inadmissible in their entirety because they are based on indisputably false

assumptions. *See Gallardo*, 497 F.3d at 733 (expert testimony must be relevant and factually linked to the case).

As certified appraisers, McCann and Southcomb are bound to comply with minimum professional standards set forth in the Uniform Standards of Professional Appraisal Practice. 225 ILCS 458/10-10. McCann and Southcomb purported to do so. McCann Rep at 30; McCann Dep. At 141:1-3; Southcomb Dep. at 23:13-20; 25:11-24. The minimum standards require McCann and Southcomb to "clearly and accurately disclose all assumptions, extraordinary assumptions, hypothetical conditions, and limiting conditions used in the assignment." USPAP, SR2-1(c) at 23:681-682; McCann Dep 184:8-233. An extraordinary assumption is a factual proposition taken to be true and which, if found to be false, "could alter the appraiser's opinions or conclusions." USPAP, Def. at 2:53; 3:82-83. An extraordinary assumption may be used only if it is required to properly develop credible opinions and conclusions, and the appraiser has a reasonable basis for the extraordinary assumption. *Id.*, SR 1-2(f) at 19:578-580.

Both McCann's and Southcomb's appraisals are falsely premised on the extraordinary assumption that there is current contamination on both the residential and lake lots. McCann's report states that his "after value" opinion is based "on the presence of tritium contamination, as cited in the Complaint." McCann Rep. at 4. He expressly assumed that tritium contamination "made it on and under [the Reeves'] property" and has "come into contact with the water feed and drain pipes, etc.," on the residential lot. *Id.* at 8; McCann Dep at 170:7. McCann admitted that his contamination assumptions could alter his opinion, and that he had not evaluated a scenario in which there was no contamination. McCann Dep at 181:24-182:10; 167:24-168:1; 180:18-181:15. The undisputed facts show there is no contamination on the residential lot. Pl. Resp. to

Def. Facts ¶ 39. Because McCann's opinion is expressly premised on the extraordinary assumption that the residential lot is contaminated, his testimony is irrelevant and unreliable, and would not assist the trier of fact.

Southcomb's testimony is premised on the extraordinary assumption that the Reeves' drinking well, the residential lot, and the lake lot, are contaminated with tritium. Southcomb Dep at 88:16-90:21; 98:22-99:12; 100:12-101:7; 114:20-24; Southcomb Rep. at 53. Southcomb testified that his appraisal assumed the present level of tritium contamination is "above a safe level" and higher than "what is deemed safe by Boos." Southcomb Dep. at 95:2-15; 102:19-103:3; 104:1-5; 115:11-21. Southcomb testified that the tritium contamination is worsening over time. Southcomb Rep. at 53; Southcomb Dep. at 90:24-91:2.

Each of these assumptions were a necessary basis for Southcomb's after value opinion. He testified that if any of these extraordinary assumptions about tritium contamination were false, his after value opinion would be unreliable and inoperative. Southcomb Dep. at 98:22-99:12; 100:12-101:7; 104:1-5; 114:20-24.

Southcomb's assumptions are indisputably false. There is no evidence of contamination on the residential lot. Pl. Resp. to Def. Facts ¶ 39. There is no evidence that the Reeves' property is contaminated at unsafe levels. Even Boos' inadmissible conclusion that the lake lot had a 41 pCi/l tritium level only suggests that the lake lot contained a tritium level far below federal and state public drinking water standards (20,000 pCi/l). *See* 40 C.F.R. § 141.66(d)(2) & Table A; Ill. Admin Code 35 § 620.410(e)(3). It is undisputed that the residential property is not a "contaminated" property as the term is generally understood by appraisers. J. Chalmers Rep., Ex. 3 at 7. And finally, there is no evidence – only pure conjecture – that any current

16

"contamination" on the Reeves' property is worsening. Boos Rep. at 19-20; *see supra* Part III.A.2.a.2. Therefore, Southcomb's appraisal opinion is premised on environmental conditions that are indisputably false.

### B. The Reeves' Summary Judgment Motion as to Liability

The Reeves cross-move for summary judgment on the issue of liability. They contend that Exelon admitted liability when Exelon communicated that it would compensate the Reeves if tritium releases affected the sale price of their property. The Reeves previously relied on the *same* communications in arguing that Exelon waived all procedural and substantive defenses to this suit. This argument was flatly rejected and deemed as frivolous. Minute Order, Dkt. No. 63 (Oct. 9, 2007). The Reeves again cite communications where Exelon representatives expressed that: "[i]f we cause you a loss, we will make you whole;" and "should the tritium release be shown to have impacted your property and caused a decrease in the [property's value at which it is sold]... Exelon will compensate you." Pl. Facts ¶¶ 7-8. Other Exelon documents reveal that the company admitted responsibility for tritium entering the ground. *Id.* ¶¶ 9-10.

Exelon's communications do not support a reasonable inference that Exelon admitted *legal* liability to the Reeves. The only inference that can be reasonably drawn is that Exelon admitted factual responsibility for releasing tritium from the Braidwood station, and that if the releases affected the Reeves' property and its sale price, then Exelon would compensate them after the sale. Apart from these statements, the Reeves proffer no additional *undisputed* evidence of Exelon's liability. The Reeves do not refer to the elements of their claims, or make any attempt to show that they have satisfied each element of their causes of action. *Branham v.*

*Snow*, 392 F.3d 896, 907 (7th Cir. 2004). Their summary judgment motion conclusively lacks merit.

### C. Motion to Exclude the Expert Opinion of Jesse Philip Harvey

In granting Exelon's summary judgment motion, the court did not consider the expert opinion of Jesse Philip Harvey. Accordingly, the Reeves' motion to exclude his opinion is moot.

## III. CONCLUSION

The Reeves have no evidence that Exelon violated a duty owed to them under the Price-Anderson Act. The opinions of the Reeves' experts are inadmissible. Exelon's motion for summary judgment is granted, and the Reeves' cross-motion for summary judgment on the issue of liability is denied. The motion to exclude the opinion of Exelon expert Jesse Philip Harvey is moot.

ENTER:

January 28, 2008

*Suzanne B. Conlon*
Suzanne B. Conlon
United States District Judge